MUL-BERRY OIL CO. et al. v. PENNY.

No. 30675. May 1, 1945.

Rehearing Denied June 12, 1945.

*159 P. 2d 243.*

Max G. Cohen, of Tulsa, George C. White, of Cushing, B. B. Blakeney, Jr., of Oklahoma City, Summers Hardy and Hawley C. Kerr, both of Tulsa, and Swank & Swank, of Stillwater, for plaintiffs in error.

Ralph B. Simcoe, Brown Moore, and Guy Horton, all of Stillwater, for defendant in error.

ARNOLD, J. Plaintiff, L. K. Penny, commenced this action in the district court of Payne county, Okla., on the 28th day of June, 1940, against the defendants, Mul-Berry Oil Company, Magnolia Petroleum Company, Sinclair-Prairie Oil Company, Skelly Oil Company, all of them corporations, and against Simon Lebow, an individual, for damages alleged to have been suffered by plaintiff from the negligence of the defendants.

Plaintiff was an agricultural tenant in possession of the N.E.¼ of section 35 and S.E.¼ of section 26, all in township 19 north, range 4 east, in Payne county, Okla.; that plaintiff was engaged in the business of buying and selling livestock and in farming; that the defendants, and each of them, operated oil wells on the watershed of Council creek, which Council creek ran through plaintiff's premises and afforded water for his stock; that defendants, and each of them, were negligent in the manner of their operations on their various leases in permitting salt water and oil to escape from their premises into tributaries of Council creek, thus polluting that stream with salt water, oil and other deleterious substances; that in the early spring of 1939 plaintiff was the owner of 48 head of grown cattle, 34 calves, and 70 head of hogs which were kept in his pasture and had access to the waters of Council creek; that about April 14, 1939, he discovered that something was wrong with his cattle and hogs; that his cattle became sick, lost weight, and were generally in a bad condition; that his hogs failed to take on weight as they should do and that these conditions in his cattle and hogs continued during the spring and summer, resulting in loss of weight and depreciation in market value, and that this loss to plaintiff was occasioned by the negligence of the defendants in permitting the salt water and oil to escape from their premises and to pollute the waters of Council creek.

Plaintiff's claim of damage was not a gross sum but was specifically itemized at $10 per head for each of his grown cattle, $10 per head for each of his calves, and $1.25 per head for each of his hogs; the total of his damage to his cattle amounted to $820 and the total damage to his hogs amounted to $87.50, making a grand total of $907.50, for which he prayed judgment.

There were preliminary motions and demurrers by the various defendants, all of which were overruled, and each answered by separate general denials and some of them pleaded affirmative defenses to plaintiff's cause of action. Plaintiff filed separate replies to each of these answers in the form of general denials.

The case came on for trial on the 28th day of April, 1941. Upon the question of injury and damage plaintiff produced five witnesses who had seen and examined his cattle at different periods after the 1st of April, 1939, on up to the middle of July of that year. All of these witnesses had for some reason inspected plaintiff's cattle and hogs in

March of that year, and by a remarkable unanimity all five of them fixed the fair market value at that time as $50 to $55 per head for the grown cattle and $18 to $20 per head for the calves. This unanimity of opinion among plaintiff's witnesses also appears in the estimates of depreciated values which they made at various times in April, May, and up to the middle of July; without any variance they all fixed the depreciated value of his grown cattle during this period at from $35 to $40 per head and of his calves at from $12 to $15 per head.

On the 14th day of April, 1939, when plaintiff first discovered the bad condition of his cattle, he took samples of the water from Council creek in his pasture and then went up to Council creek to its various tributaries on and near the various leases operated by the defendants, and took samples of the water at various places on his route, tasting the water at each location and finding that it tasted salty. These samples of water which plaintiff took that day were placed by him in his cellar and there kept until the case was set for trial, when they were turned over to his attorney and produced in court as evidence in this case. No analysis of these samples or any of them was ever made for the purpose of determining the salt content, and no evidence of the salt content was offered in evidence except by the oral testimony of witnesses who tasted the same.

Plaintiff had been in the cattle business for 17 years, and for a number of years previous to 1939 had occupied the same premises and had known for seven or eight years that the wells of the defendants on their leases produced salt water. When he discovered the condition of his cattle on the 14th day of April, 1939, he did not remove them from the pasture nor did he close the gate through which they had access to the waters of Council creek. On the 15th day of May, 1939, plaintiff called in Dr. L. H. Schwabe, a veterinarian, who inspected the cattle and testified that he found symptoms of salt water and oil poisoning, but that he gave no prescription for any treatment of them. He did not know what salt content of water was injurious to cattle.

L. L. Kenyon testified for plaintiff that in March, 1939, when he saw plaintiff's cattle, they were on the wheat pasture and were in good condition; that he saw them again the latter part of April after they had been removed from the wheat pasture and placed in the grass pasture and that 40 or 50 per cent of them did not look so good; his estimate of the market value of the cattle while on the wheat and of the market value after they had been placed on the grass was the same as other witnesses; on August 19, 1939, he bought ten head of calves from the plaintiff at $31.76 per head, which he testified was the top of the market at that time.

J. L. Fisher, a witness for plaintiff, owns and lives on the N.E.¼ of section 27 in the same township and range, and he testified, as did the other witnesses, to the values of the stock before and after the 1st of April, and further testified that his own house is piped for water which is pumped to it from Council creek and that his cattle and horses have drunk the water from Council creek for 12 or 15 years; that he uses it for all domestic purposes except drinking, that he doesn't use it for drinking purposes because it is untreated creek water.

On behalf of defendants various witnesses testified to the small production in all of the wells involved in this action, ranging from two to five barrels per day each, and that some of them produced salt water, but that it is taken care of by pits constructed by the various companies at large expense and afterwards disposed of in various ways without permitting the salt water or oil to escape from their premises to any extent which would result in polluting of the creeks. Defendants introduced evidence showing that in August, 1939, Dr. Moe, a veterinarian of the A. & M. College at Stillwater, Okla., saw plaintiff's cattle; their condition was good; he took

samples of water from Council creek in the pasture of the plaintiff and turned them over to Dr. Heller, chemist at A. & M. College, for analysis; that other samples of water from Council creek and its tributaries were submitted by defendants to John F. Sage, chemist in charge of the Sinclair-Prairie Chemical Laboratory, and to the General Laboratory in Oklahoma City; that the samples which Dr. Heller analyzed disclosed that the highest salt content in either of them was 486 parts to the million, and all three of the chemists agreed that for salt in water to be injurious to animals the salt content must be at least 15,000 parts to the million; that any amount of salt less than this is not dangerous to animals; Dr. Heller further testified that the salt content of the samples analyzed by him was less than that of the average family drinking water in Oklahoma.

There was verdict and judgment for the exact amount, $907.50, claimed by plaintiff, and defendants appeal.

The five defendants have filed separate assignments of error in this court, but most of them are identical. The first assignment of each of the defendants is alleged error of the trial court in overruling the motion for new trial. The numerous assignments of error are presented and argued in the brief under four propositions. In the view taken of the case here it is only necessary to consider the assignment based on the excessiveness of the verdict and judgment.

23 O.S. 1941 § 61 reads as follows:

"For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this chapter, is the amount which will compensate for all detriment proximately caused thereby, whether it could have been anticipated or not."

As before stated herein plaintiff did not sue for a gross sum as damage to his entire herd of cattle, but claimed a damage of $10 a head for each of his grown cattle and $10 a head for each of his calves. He also asked for $1.25 for damage to each head of his hogs.

Among the grown cattle owned by the plaintiff was one bull which he testified was not intended for market but was kept for breeding purposes only, and there is not a scintilla of evidence in the record to show any injury or impairment of this animal for the purpose for which he was owned and kept.

Of the 34 head of calves which plaintiff owned, ten of them were sold in August, 1939, for $31.76 per head, which both plaintiff and the purchaser, Kenyon, testified was the top of the market. Plaintiff's testimony, and that of each of his witnesses who testified to the depreciation of the calves during the months of April, May, and up to the middle of July, was that they were worth not more than $12 or $15 per head during that period of time. It is evident from this that the ten head of calves were not injured and damaged as alleged by plaintiff, but that they were among the 40 or 50 per cent of plaintiff's cattle which Kenyon testified were in good condition and apparently not affected like the others in the latter part of April. Against the positive testimony of plaintiff and his witness, Kenyon, that the market value of these ten head of calves in August was $31.76, little weight can be given to the lay opinions of other witnesses who said they were worth only $12 or $15 per head during the three months preceding their sale. It is therefore evident that there is no evidence in the record which reasonably sustains the verdict of the jury awarding the full amount of damage claimed to have been done to the bull and to these ten head of calves. Anderson v. Graham, 87 Okla. 278, 210 P. 281; Alexander Drug Co. v. Whitaker, 146 Okla. 61, 293 P. 264.

As to the 47 head of cows and the remaining 24 head of calves of the plaintiff, the evidence is in conflict as to their condition in April, May, and July of 1939, and as to the cause for the condition in which they were. On May 15th Dr. L. H. Schwabe inspected the cattle and testified that their condition showed symptoms of salt water and oil

poisoning, but he stated that he didn't know the quantity of salt in water which would be injurious to animals. The testimony of plaintiff and of his other witnesses, who were neighbors and farmers, was that the condition of the cattle when they saw them in those months indicated poisoning from salt water and oil. The witness Kenyon testified that when he saw the cattle in March of 1939 they were then on wheat pasture and were in good condition; that when he saw them again the latter part of April they had been removed to a grass pasture and that 40 or 50 per cent of them showed deterioration, but he also testified that on the 6th day of April of that year there was a hard freeze which "burned up" the pasture grass and that this condition lasted for two weeks or more. He also testified, as did other witnesses for plaintiff, that most of the cows had suckling calves during this period. The witness Berry testified that he didn't know what caused the condition of the cattle when he saw them in July but that he knew that salt water or "burned up" pasture and suckling calves would all have something to do with the condition of the cattle as he found it. The only evidence as to the polluted and poisonous character of the water which plaintiff's cattle drank was the testimony of plaintiff and his neighbors that they had tasted the water and it tasted salty. None of them attempted to estimate the salt content of the water, and certainly the samples of the water presented to the jury for examination without analysis would not disclose the extent of its salt content. No analysis of any of these samples was made. Plaintiff testified that there was no oil floating in the jars containing his samples.

On the other hand, two samples of water taken from Council creek by Dr. Moe in August of 1939 were analyzed by Dr. Heller of A. & M. College at Stillwater and his testimony was that the highest salt content of either sample was 486 parts to the million, while the ratio required to produce injury to animals, determined by him as a result of years of experimentation, was 15,000 parts to the million. Also samples of water were procured by the defendants from Mill creek, Pencil creek, and other points on Council creek along the route followed by plaintiff in securing his samples. These samples were by the defendants submitted to chemists in Tulsa and in Oklahoma City for analysis and their analyses of these samples showed a salt content much less than that required to produce injury to animals. They agreed with Dr. Heller that a salt content of less than 15,000 parts to the million did not make water injurious to animals.

It is unexplained in the record why the plaintiff, after discovering the condition of the cattle on the 14th day of April and after determining in his own mind that the salt in the water of Council Creek was the cause of their condition, continued to let them have access to that water and waited until the 15th day of May to call in a veterinarian to determine their ailment. It is likewise unexplained in the record why he did not remove his cattle to other pastures as he later did do. Nor is it shown in the evidence that while the cattle were on the wheat pasture they were excluded from drinking from Council creek.

In conformity with the provisions of 23 O.S. 1941 § 61, this court has established and uniformly followed the rule that in actions for damage to property resulting from the pollution of streams the recovery must not exceed the amount of damage done. In Gulf Refining Co. v. Carruthers, 190 Okla. 61, 120 P. 2d 991, paragraph 2 of the syllabus reads as follows:

"Where, in an action to recover damages for injury to cattle, there is competent evidence tending to prove the injury, the cause, nature and extent thereof, and there is also competent evidence tending to prove the market value of the cattle immediately before and after the alleged injury, it is for the jury to fix the amount of the injury not to exceed a sum greater than the proven difference between the two values stated."

In a supplemental brief in behalf of plaintiff attention of this court has been called to the case of Maley et al. v. Henley, 195 Okla. 51, 154 P. 2d 970, and it is contended that the decision in that case is controlling here. The fact situation in that case is quite different from the instant case. There the oil well discharged salt water directly into a small ravine which flowed through plaintiff's premises and which was the source of drinking water for his cattle. In that case also there was a claim of damage both to his cattle and to his land, the claim of damage to the cattle being in the gross sum of $220 and injury to the land claimed to be $400, and there was a verdict of the jury for $300 damages. As far as the fact situation is concerned and as far as the elements of damage are concerned that case is distinctly different from the instant case.

Though the contention is in effect made by plaintiffs in error that proof of certain objective symptoms in livestock which may result from drinking water excessively polluted by salt, when other causes to which they were exposed may produce similar objective symptoms, is insufficient to fix liability in the absence of proof that the alleged salt pollution was of sufficient degree to produce the result complained of where there was uncontradicted expert evidence showing what degree of salt pollution is required to cause injury to livestock presents a serious question under all the facts and circumstances disclosed by this record, it is unnecessary to pass on this proposition in view of our determination that the cause must be reversed on account of the insufficiency of the evidence to support the judgment.

Reversed.

GIBSON, C.J., and BAYLESS, WELCH, and DAVISON, JJ., concur. RILEY, J., concurs in conclusion. HURST, V.C.J., and CORN, J., dissent.